IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Jason Charles Bratka,<br><br>                    Plaintiff,<br><br>        vs.<br><br>Carolyn W. Colvin,<br>Commissioner of Social Security,[1]<br><br>                    Defendant. | Civil Action No. 6:13-321-JFA-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") in August 2009, alleging that he became unable to work on May 5, 2007. The application was denied initially and on reconsideration by the Social Security Administration. On August 9, 2010, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Mark Leaptrot, an impartial vocational expert, appeared on April 8, 2011,

---

[1]Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

considered the case *de novo*, and on August 30, 2011, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on January 9, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant will meet the insured status requirements of the Social Security Act through December 31, 2012.

(2)    The claimant has not engaged in substantial gainful activity since May 5, 2007, the alleged onset date (20 C.F.R § 404.1571 *et seq*).

(3)    The claimant has the following severe combination of impairments: Lumbar degenerative disc disease, status post fusion; hypertension; and diabetes mellitus (20 C.F.R. § 404.1520(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a range of light work as defined in 20 C.F.R. § 404.1567(b) (lift, carry, push pull 20 pounds occasionally, 10 pounds frequently, sit, stand and walk about 6 out of 8 hours) except the claimant can only occasionally climb and balance, otherwise he can perform frequently all other posturals. The claimant must avoid

2

concentrated exposure to hazards. The claimant's mental impairments are found not to be severe.

(6)     The claimant is unable to perform any past relevant work (20 C.F.R. §  404.1565).

(7)     The claimant was born on October 20, 1976, and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. § 404.1563).

(8)     The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569 and 404.1569(a)).

(11)     The claimant has not been under a disability, as defined in the Social Security Act, from May 5, 2007, through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

3

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. § 404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).  He must make a *prima facie* showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff

4

can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 30 years old on his alleged disability onset date, May 5, 2007, and he was 34 years old on the date of the ALJ's decision. He has a high school

education and past relevant work experience as a corrections officer and a construction worker.

### *Medical Evidence*

The plaintiff has a long history of back pain due to degenerative disk disease, for which he has been treated with a number of prescription medications including Lortab and Soma (Tr. 242-44, 261). Dr. Michael Bucci, a neurosurgeon, treated the plaintiff for severe low back pain from October 26, 2005, through June 19, 2007 (Tr. 269-90). Conservative treatment during 2005 failed, and Dr. Bucci recommended surgery on February 7, 2006 (Tr. 277). In March 2007, Dr. Bucci advised the plaintiff that his prescriptions were temporarily suspended because he was under investigation for medication abuse (Tr. 339).

The plaintiff was treated by Dr. John Milas from February 14, 2006, through February 6, 2007, for treatment of a laceration of his right arm that became infected following a motorcycle accident (Tr. 238-48). Dr. Milas also reported that the plaintiff was having problems with mood swings and was taking Lortab for chronic low back pain and Soma for muscle spasm (Tr. 242). On June 26, 2006, Dr. Milas saw the plaintiff for chronic back pain for which he was taking Lortab and Soma (Tr. 244).

The plaintiff was treated for chronic pain by Dr. Robert LeBlond, a pain specialist, from February 16, 2007, to June 7, 2007 (Tr. 261-68). Dr. LeBlond prescribed the plaintiff Lortab for pain and Ambien for sleep. Dr. LeBlond noted that the plaintiff's pain "appears to be genuine" (Tr. 261). Dr. LeBlond administered four epidural steroid injections for treatment of the plaintiff's low back pain (Tr. 262-64, 267).

The plaintiff received physical therapy from Elite Physical Therapy from April 27, 2007 through July 12, 2007 (Tr. 291-307).

In May 2007, the plaintiff was hospitalized at St. Francis Hospital due to lumbar degenerative disc disease and chronic back pain (Tr. 250-60). He underwent spinal

6

laminectomy and facetectomy at L5-S1; bilateral diskectomy at L5-S1; bilateral posterior lumbar interbody fusion surgery with capstone bone autograft and BNP; bilateral pedicle screw fusion at L5-S1; and bilateral lateral fusion at L5-S1 (Tr. 251-55).  Post-surgery X-rays confirmed "good anatomical alignment" of the grafts and hardware (Tr. 251), and the plaintiff's pain decreased in subsequent months (Tr. 322).

On June 12, 2007, Dr. Bucci treated the plaintiff for post operative hematoma (Tr. 270).  On August 10, 2007, Dr. LeBlond reported that the plaintiff suffered from significant back pain and could not return to his job as a corrections officer as there was a significant risk for re-injury (Tr. 317).  On August 17, 2007, Dr. Bucci advised that the plaintiff could no longer work as a corrections officer, because certain on-the-job hazards could potentially cause permanent serious injuries to his back (Tr. 318).

On December 9, 2008, Dr. Milas reported that the plaintiff was suffering from generalized anxiety and was under considerable distress due to loss of his job, loss of insurance, and lack of money.  He noted that Dr. LeBlond continued to treat the plaintiff for chronic back pain (Tr. 343).  On January 21, 2009 Dr. Milas prescribed Soma, Klonopin, and Lortab for chronic back pain and chronic anxiety (Tr. 342)

In March 2009, the plaintiff reported that his back pain had again increased, particularly since his Soma had been discontinued.  Dr. LeBlond noted on March 25, 2009, that the plaintiff had some tenderness and spasms in the paraspinals and decreased range of motion, but also observed that motor strength and sensation were intact, deep tendon reflexes were equal, and straight leg raising tests were negative (Tr. 319).  He opined that the pain flare-up was attributable to the rainy weather and lack of Soma, for which he renewed a prescription.  Dr. LeBlond also treated the plaintiff for anxiety and depression (*id*.).  On April 22, 2009, Dr. Milas treated the plaintiff for chronic back pain (Tr. 341).

In September 2009, the plaintiff was treated by Dr. Lindamood of Internal Medicine Associates for back pain and depression (Tr. 345-47).  Dr. Lindamood observed

that his gait was normal and that he had no obvious motor or sensory deficits; he also noted that the plaintiff had a normal mood and appropriate affect (Tr. 346). He recommended, among other things, weight loss and exercise. (Tr. 346-47).

The plaintiff also consulted with a pain management specialist, Dr. Rebecca Holdren, on September 9, 2009, reporting increased pain in his back and leg and asking for Soma (Tr. 349-58). Dr. Holdren noted tenderness and muscle spasms in the right lumbar paraspinal area and midline lumbar area, but full and painless range of motion of the thoracic and lumbar spine, normal stability, and normal muscle strength and tone (Tr. 351-52). She diagnosed the plaintiff with low back pain, post laminectomy lumbar syndrome, and long term drug use. Dr. Holdren also noted full muscle strength and tone in both legs, normal sensation, and negative straight leg raising, and that the plaintiff had an antalgic gait, but was able to heel-toe walk (Tr. 352). Dr. Holdren recommended that the plaintiff try certain exercises to relieve his pain, but declined to prescribe opiates or give him medication other than samples (*id*.).

Dr. Holdren made similar findings during a follow up on October 7, 2009. The doctor noted that the plaintiff continued to suffer from fatigue and malaise. Physical exam revealed joint and muscular pain. The plaintiff suffered memory loss, and his hands were trembling (Tr. 355). The plaintiff had depressive symptoms, insomnia, and increased stress level. His mood and effect were anxious, apprehensive, and tense. There was marked tenderness in the right lumbar paraspinal area and mild tenderness in the midline lumbar area (Tr. 356). He had muscle spasm in the middle back and low back and also had right lower paraspinal muscle tenderness. He had altered posture described as forward flexed with internal rotation of the shoulder. He walked with an antalgic, wide-based gait. Dr. Holdren again diagnosed the plaintiff suffering from post laminectomy lumbar syndrome, low back pain, and long term drug use for chronic pain (Tr. 357). After consultation with the plaintiff's other doctors, Dr. Holdren gave him a limited prescription for Avenza, Lortab, and

8

Soma (Tr. 354-58).  In addition, she ordered an MRI of the lumbar spine, which revealed some mild degenerative changes and a mild-to-moderate posterior disk bulge at L4-L5 with accompanying facet and ligamentous changes producing borderline mid-central canal stenosis (Tr. 393).

From October 29, 2009, through April 5, 2010, the plaintiff was treated by Dr. Derek Frieden, a pain specialist (Tr. 387-92).  On October 29, 2009, Dr, Frieden diagnosed the plaintiff with post laminectomy syndrome, lumbar facet arthropathy, and lumbar radiculopathy.  Dr. Frieden recommended bilateral transforaminal steroid injections (Tr. 392).  In December 2009, the plaintiff reported that these injections had not provided any relief, and Dr. Frieden discussed with the plaintiff the possibility of having a spinal cord stimulator implanted.  The doctor diagnosed the plaintiff to be suffering from failed back surgery syndrome.  He prescribed Lortab for pain and Zanaflex for muscle spasm and recommended spinal cord stimulation trial (Tr. 391).

The plaintiff also consulted with a psychiatrist, Shane Sherbondy, M.D., and therapist Wendy Chaney on several occasions beginning in October 2009 (Tr. 628-32).  Dr. Sherbondy noted following examination that the plaintiff had normal thought content, logical thought process, normal attention and concentration, intact memory, and that he was able to perform a series of cognitive tests, including spelling, word recall, and serial seven subtractions, successfully (Tr. 629-30). He diagnosed the plaintiff with depression, anxiety, and opiate dependency and recommended certain medication adjustments (*id*.). Ms. Chaney reported that the plaintiff suffered from social anxiety, anger issues, and mood swings (Tr. 632).

In December 2009, the plaintiff told a nurse practitioner that he had misplaced his Soma and needed an early refill; upon calling the pharmacy and one of the plaintiff's doctors, the nurse practitioner learned that he had been simultaneously getting Lortab

prescriptions filled from two different providers (Tr. 528). The plaintiff declined a referral for treatment for painkiller addiction (*id.*).

In January 2010, the plaintiff was referred to a neurologist, Kent Kistler, M.D., following complaints of "altered mental status," including excessive drowsiness and slurred speech (Tr. 382-84). At the time, he was taking clonazepam, lamotrigine, Cymbalta, Zyprexa, Soma, Lortab, and Ambien (Tr. 382). Dr. Kistler observed that the plaintiff was alert, oriented, and coherent, with normal thought content and normal recall, though there were "significant contradictions" in his description of his medication usage history (Tr. 383-84). He opined that the plaintiff's altered mental status was most likely medication-related and rejected the plaintiff's request for muscle relaxants (Tr. 384). To rule out other conditions, he also ordered a CT scan of the head, which was normal (Tr. 385).

On January 14, 2010, Dr. Frieden reported that the plaintiff continued to suffer low back pain with intermittent pain into his legs. He prescribed Percocet for pain and a TENS unit for pain control and again recommended a spinal cord stimulation trial (Tr. 390).

The plaintiff proceeded with a spinal cord stimulation trial on February 16, 2010, and reported that he was "extremely satisfied" with the results (Tr. 388-89). On February 19, 2010, Dr. Frieden reported that the plaintiff had obtained 60% pain relief with the spinal cord stimulator and that he wished to proceed with permanent implant of the spinal cord stimulator (T. 388). While the plaintiff waited for a permanent implant, Dr. Frieden continued to prescribe Lortab (Tr. 387).

On April 19, 2010, the plaintiff underwent surgery to have a spinal cord stimulator implanted permanently (Tr. 398-401). Subsequently, he reported that it was not working; the manufacturer also could not get it to work, and, due to insurance complications, the plaintiff was unable to have it removed or replaced (Tr. 584).

The plaintiff was treated by Kathryn Benson, a nurse practitioner with Premier Family Practice, from October 27, 2009, through May 17, 2010 (Tr. 487-535). Ms. Benson

treated the plaintiff for back pain, insomnia, depression, muscle spasms in the low back, and anxiety.  It was reported that the plaintiff suffered anger/temper issues secondary to anxiety and depression.  It was also noted that the plaintiff was suffering from severe low back pain (Tr. 489, 494, 497, 502, 508, 512, 514, 517, 519, 522, 525, 530, 533).  The plaintiff sought an early refill of Soma from Ms. Benson in May 2010, telling her that his medications were in his truck, which had been towed (Tr. 492).  Ms Benson learned from the pharmacy, however, that Dr. Bucci had just given the plaintiff Soma, and she declined to fill the prescription (Tr. 492)

On June 15, 2010, the plaintiff began seeing specialist Justin Hutcheson, M.D. at the Carolinas Center for Advanced Management of Pain for pain management (Tr. 540-49).  Dr. Hutcheson noted that the plaintiff had some tenderness and decreased range of motion in the thoracic/lumbar spine, but that his gait and station were normal, muscle and reflex testing was normal, sensation was normal, and straight leg raise testing was negative (Tr. 546-47).  Dr. Hutcheson diagnosed the plaintiff as suffering from depression, myofascial pain syndrome, post-laminectomy pain syndrome of the lumbar spine and lumbar radiculopathy (T. 547).  Dr. Hutcheson prescribed Zanaflex, Soma, and Lortab for pain and muscle spasms (T. 548).  On June 29, 2010, the plaintiff had a follow-up visit with Mary Cohen, a nurse practitioner (T. 540-44).  Ms. Cohen found no change in the plaintiff's condition or diagnosis and prescribed Lortab, Ultram, and Robaxin for pain, and Soma for spasms (T. 543).  The plaintiff continued under the regular care of the Carolinas Center for the Advanced Management of Pain for treatment of chronic, severe pain (T. 582-603).

Also in June 2010, the plaintiff reported breakthrough depression and anxiety symptoms to family physician Michael Atkinson, M.D., who observed that he was fully oriented, with normal memory and appropriate judgment, mood, and affect (Tr. 577).  Dr. Atkinson did not prescribe any new treatments; he noted that plaintiff had a mental health appointment pending and renewed his Lamictal and Cymbalta prescriptions (*id.*).

11

On July 2, 2010, the plaintiff was referred to clinical psychologist C. David Tollison, Ph.D., for an evaluation and opioid risk assessment. The plaintiff reported experiencing mood swings and difficulty sleeping, especially after running out of certain prescriptions. In addition, he reported difficulties concentrating and controlling his emotions; Dr. Tollison noted that he was "weeping" during the evaluation. The plaintiff reported that he would lose his train of thought and was having issues with anger and losing his temper easily. The plaintiff described himself as suffering from sadness, dysphoria, and anhedonia, reduced pleasure in living, inadequacy, reduced/lack of optimism, discouragement, helplessness, and hopelessness. Dr. Tollison further observed that the plaintiff was fully oriented, alert, and cooperative; had normal affect and mood with no unusual mannerisms or movements; and had normal cognitive skills; and that there was no evidence of hallucinations or psychotic symptoms. He also noted the plaintiff's reports that his participation in housework and social activities were limited primarily by pain. Dr. Tollison assessed the plaintiff as having a major depressive disorder with anxiety features and a moderate opioid risk, and he recommended altering his psychotropic prescriptions. Dr. Tollison reported that the plaintiff had a Global Assessment of Functioning ("GAF") of 50[3] (Tr. 537-39). Dr. Tollison saw the plaintiff again on July 30, 2010, and noted that his generalized anxiety disorder and major severe depression were unchanged. Dr. Tollison referred the plaintiff for psychiatric treatment (Tr. 604-05).

Dr. Atkinson treated the plaintiff from June 3, 2010, through July 23, 2010 (Tr. 575-81). On June 3, 2010, Dr. Atkinson diagnosed the plaintiff as suffering from lumbago, bipolar affective disorder, and insomnia (Tr. 580). Dr. Atkinson again saw the plaintiff on

---

[3]GAF ranks psychological, social, and occupational functioning on a hypothetical continuum of mental illness ranging from zero to 100. *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*

June 15, 2010, with the same diagnosis (Tr. 577-78).  On July 23, 2010, Dr. Atkinson again treated the plaintiff for hypertension and nausea with vomiting (Tr. 575-76).

On October 12, 2010, the plaintiff visited psychiatrist Perry Lupo, M.D., who reviewed the plaintiff's medical history, noted various sources of stress, and revised the plaintiff's medication regime.  Dr. Lupo saw the plaintiff three more times between October 2010 and January 2011, during which time he noted that the plaintiff continued to be "easily stressed," and he continued to adjust the plaintiff's medications (Tr. 612-14).

The plaintiff continued to see Dr. Hutcheson for pain management. Dr. Hutcheson and various nurse practitioners in his office continued to detect pain and decreased range of motion in the thoracic/lumbar spine, but normal muscle strength, sensation, and reflexes (Tr. 588-602).  They also continued to make periodic medication adjustments (*id*.).

On March 4, 2011, the plaintiff was treated at Hillcrest Memorial Hospital emergency room complaining of aggravated back pain and swelling after a fall (Tr. 615-27). There was  tenderness in the upper and lower midline area of the back and back spasms, but his extremities were normal and straight leg raise tests were negative (Tr. 617, 623-24). X-ray of the thoracic spine revealed degenerative disc changes in the lower thoracic spine (Tr. 620). X-rays of the lumbar spine also revealed degenerative disc changes.  In addition, his mental status was assessed as involving normal affect, insight, concentration, and memory (Tr. 617, 624).  The plaintiff was diagnosed with a back contusion and lumbar sprain and given intramuscular injections of Dilaudid (Tr. 617, 624).

A CT scan performed on September 21, 2011, revealed protruding disc at L4-5. There was stenosis affecting the exiting L5 roots bilaterally (Tr. 635-36).

Dr. Timothy McHenry examined the plaintiff on November 9, 2011. Dr. McHenry reported that an epidural steroid injection done by Dr. Jarecky, a pain specialist,

13

in October had not relieved the plaintiff's pain.  Physical exam revealed joint and muscle pain (Tr. 652).  Dr. McHenry diagnosed lumbar spinal stenosis (Tr. 651-53; *see* Tr. 645).

On December 13, 2011, Dr. Jarecky gave the plaintiff another epidural steroid injection for chronic pain (Tr. 645-47).  Dr. Jarecky reported that CT myelogram showed a broad-based disk bulge at L4-5 causing moderate central stenosis and more significant lateral recessed stenosis with bilateral nerve root filling defects.  He diagnosed the plaintiff as suffering from degenerative disk disease of the lumbar spine and lumbar spinal stenosis (Tr. 645-47).

### Opinion Evidence

In November 2009, state agency physician Hugh Clarke, M.D., reviewed the medical evidence of record and opined that the plaintiff was capable of light work, except that he could only occasionally climb ladders, ropes, and scaffolds, and needed to avoid concentrated exposure to hazards (Tr. 360-67).  In July 2010, state agency physician Angela Saito, M.D., also reviewed the medical evidence of record and largely concurred with this assessment, but further opined that the plaintiff could only occasionally balance, stoop, or climb ramps and stairs. (Tr. 567-74).

In January 2010, state agency psychologist Larry Clanton, Ph.D., reviewed the medical evidence of record and opined that the plaintiff did not have a severe mental impairment (Tr. 368-81).  He further opined that the plaintiff had no limitations in maintaining activities of daily living, social functioning, or concentration, persistence, and pace, and that he had not experienced any extended episodes of decompensation (Tr. 378).  In July 2010, state agency psychologist Lisa Varner, Ph.D., reviewed the updated medical records and likewise opined that the plaintiff's mental impairments were not severe (Tr. 553-66).  She further opined that the evidence indicated mild limitations in maintaining activities of daily living, social functioning, and concentration, persistence, and pace, and that he had not experienced any extended episodes of decompensation (Tr. 563).  She provided detailed

14

citations to the plaintiff's records of mental health treatment from various providers over time to explain this assessment (Tr. 565).

On February 18, 2011, Dr. Lupo completed a Functional Capacity Questionnaire listing the limitations resulting from the plaintiff's psychiatric condition (Tr. 609-11). Dr. Lupo reported that the plaintiff's abilities to follow work rules, relate to co-workers, interact with supervisors, deal with work stresses, and maintain attention and concentration were "poor to none." He stated that the plaintiff's ability to deal with the public, use judgment, and function independently were only "fair," which is defined on the form as "seriously limited, but not precluded" (Tr. 609). Dr. Lupo stated that the plaintiff's abilities to understand, remember, and carry out complex or detailed job instructions were poor to none, and his ability to understand, remember, and carry out simple job instructions was seriously limited. Dr. Lupo noted that the plaintiff's ability to demonstrate reliability was poor to none, and his abilities to maintain personal appearance, behave in an emotionally stable manner, and relate predictably in social situations were seriously limited (Tr. 610).

On April 4, 2012, Dr. Lupo completed a second Functional Capacity Evaluation (Tr. 654-56). Dr. Lupo stated that the plaintiff's ability to follow work rules or relate to co-workers was "poor/none" and his ability to deal with the public and use judgment was "fair," meaning seriously limited, although not completely precluded. Dr. Lupo reported that "severity of depressive illness and chronic pain would preclude him being able to gain or maintain employment" (Tr. 654). Dr. Lupo concluded that the plaintiff's ability to understand, remember, and carry out complex or detailed job instructions was poor to none and his ability to understand and remember and carry out simple job instructions was seriously limited. Dr. Lupo also opined that the plaintiff's abilities to maintain personal appearance, behave in an emotionally stable manner, and relate predictably in social situations were seriously limited, and his ability to demonstrate reliability was poor to none. Dr. Lupo again

15

repeated his opinion that the plaintiff was unable to gain or maintain regular employment (Tr. 655).

### Administrative Hearing Testimony

At the hearing on April 8, 2011, the plaintiff testified that he tried to limit his activities because he was concerned about rupturing his bulging disk (Tr. 39).  He added that he had difficulty stooping and bending, that he became exhausted walking from his apartment to the dumpster, which was 65 to 70 yards away, and that walking from the parking lot to the elevator in the hearing building was "as far as [he] could make it" (Tr. 39-40).  The plaintiff stated that he had been "just about to get up and have to stand" because he had been sitting too long (Tr. 39); he also mentioned that he was wearing a back brace that he would need to take off soon because it was pressing against his bulging disk (Tr. 40).

The plaintiff further testified that he was depressed because of his back condition, that his mother had to handle his finances because he had no money in the bank, that his mother had to do his grocery shopping because he became panicked around crowds, and that he needed to take a number of medications to handle his pain and to sleep.  He is no longer able to play sports with his children.  He takes medicine to sleep at night in addition to the pain medications.  He has chronic pain in his low back radiating down his left leg and into his neck.  He aches in the morning and suffers sharp, stabbing pain and throbbing.  The pain is constant and severe (Tr. 35-37).  He also said that he did not respond as much to the medications he was currently taking because he had been on them for so long and that his pain management doctor wanted to put him on stronger medications, but that he was hesitant because the medications were so addictive.  The plaintiff tried to return to work but could only hold out for two or three days.  His leg gives way and he falls unexpectedly (Tr. 36-37).  The plaintiff further testified that his pain affected his mental capabilities, particularly his concentration, and makes him lose track of days (Tr. 41) and that his various medications gave him mood swings and further inhibited his concentration (Tr.

35, 42-43).  The plaintiff testified that he has no health insurance or income to get treatment, and his mother pays for his medications.  He receives state retirement disability benefits (Tr. 39).  He has been unable to take recommended injections because of no insurance and limited financial resources (Tr. 40).

The plaintiff testified that he spent most of the day moving between the recliner and the couch, watching TV (Tr. 43); he also later stated he spent time playing on the Play Station and Wii with his children (Tr. 51).  He has problems with his balance due to medication, no longer has any hobbies, does not do housework, and uses a cane at times (Tr. 42, 49, 53).  The plaintiff wears a back brace and has severe muscle spasms.  He uses a heating pad for pain (Tr. 52).  He stated that he limited his driving to no more than 20 or 30 minutes at a time and could not remember the last time he had been on vacation "due to just not being able to sit in a vehicle long enough" to get anywhere (Tr. 44).  He later admitted, however, that he had traveled to Jamaica in 2009 and that the trip involved flying first to Philadelphia and from there to Jamaica (Tr. 55).  He also mentioned regularly driving to pick up his son from school, or to visit friends or family, and stated he had driven to the hearing (Tr. 46).  The plaintiff stated that he had a cane, but generally tried to avoid walking distances long enough to require it.  He did not bring the cane to the hearing (Tr. 53).

A vocational expert also testified at the hearing (Tr. 56-60).  The ALJ first asked him what jobs an individual of the plaintiff's age, education, and experience could perform if he was limited to light work; could only occasionally climb ladders, ropes, or scaffolds; could frequently perform all other postural movements; and needed to avoid concentrated exposure to hazards (Tr. 57).  The vocational expert responded that this individual could not perform any of the plaintiff's prior jobs, but could perform other jobs including information clerk, routing clerk, or office mail clerk (Tr. 57-58).  He further testified that the same jobs would be available if the individual was further limited to only occasional climbing and balancing (Tr. 58).  In response to the plaintiff's counsel, the vocational expert also testified

that no jobs would be available if the individual was unable to sustain concentration, deal with work stresses, or interact with supervisors for one hour out of each eight-hour workday, because "one is expected to give good attention and concentration in at least two-hour blocks up to four times a day" (Tr. 59). He testified that absences of more than three days per month would also preclude employment (*id.*).

## ANALYSIS

The plaintiff argues the ALJ erred by: (1)  concluding that his mental impairments were not severe and (2)  assigning no weight to the opinion of his treating psychiatrist, Dr. Lupo. The plaintiff further argues that the Appeals Council erred by failing to analyze and include specific reasoning and findings concerning the new evidence he submitted.

### *Severe Impairments*

The plaintiff first argues that the ALJ erred in concluding that his mental impairments were not severe. An impairment is considered "severe" only if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c); *see Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (the "'mere presence of a condition is not sufficient to make a step-two showing'"; rather, the claimant must show "how it significantly limits her physical or mental ability to do basic work activities") (quoting *Williamson v. Barnhart*, 350 F.3d 1097, 1100 (10th Cir. 2003)).

The ALJ acknowledged the plaintiff's mental impairments, affective disorder, anxiety, and substance abuse disorder, but determined that they did not cause more than minimal limitation on the plaintiff's ability to perform basic mental work activities and that, accordingly, they were not severe (Tr. 13-15). In making this determination, the ALJ noted that the plaintiff had consulted with a number of providers regarding depression and prescription drug overuse symptoms, but that the providers had generally observed him to be functioning within normal limits (Tr. 14). For example, Dr. Sherbondy, who diagnosed the

18

plaintiff with depression, anxiety, and opiate dependency in October 2009, noted following examination that the plaintiff had normal thought content, logical thought process, normal attention and concentration, and intact memory, and that he was able to perform a series of cognitive tests, including serial seven subtractions, successfully (Tr. 14; *see* Tr. 629-30). When the plaintiff visited Dr. Kistler with concerns about an altered mental state due to medications in January 2010, Dr. Kistler detected no mental status abnormalities; the plaintiff was alert and fully oriented with normal speech, recall, and thought content (Tr. 14; *see* Tr. 382-84). Dr. Atkinson also commented on the plaintiff's normal memory, mood, affect, and judgment during a June 2010 appointment (Tr. 14; *see* Tr. 577), and notwithstanding his intense back pain during two March 2011 emergency room visits, the plaintiff was observed to retain normal orientation, affect, insight, and concentration (Tr. 14; *see* Tr. 617, 624).

As argued by the Commissioner, the ALJ also considered evidence arguably suggesting greater impairment, such as Dr. Tollison's report of his July 2010 evaluation, during which the plaintiff cried while reporting difficulties controlling his emotions and maintaining his train of thought  (Tr. 537). As the ALJ noted (Tr. 14), however, Dr. Tollison nevertheless observed that the plaintiff was fully oriented, alert, and cooperative; had normal affect and mood with no unusual mannerisms or movements; and had normal cognitive skills (Tr. 537-38). Dr. Tollison also noted that the plaintiff continued to perform activities such as driving, cooking, cleaning, and errands, although limited, and seeing family and friends.  Dr. Tollison noted that the plaintiff reported that his participation was limited primarily by physical pain, as opposed to any mental impairments. (Tr. 14; *see* Tr. 538).

Moreover, the ALJ reasonably relied on the opinions of state agency psychologists Drs. Varner and Clanton, who concluded that the plaintiff's mental impairments were not severe (Tr. 14; see Tr. 368-81, 563-65).  Dr. Varner specifically took Dr. Tollison's

19

evaluation into account[4] (Tr. 565). These state agency psychologists found that the plaintiff's mental impairments imposed either no limitations (Dr. Clanton) or only mild limitations (Dr. Varner) in his activities of daily living, social functioning, and concentration, persistence, and pace (Tr. 378, 563). As argued by the Commissioner, the limited record evidence of specific functional limitations supports these assessments, which, in turn, support a determination that the plaintiff's mental impairments were not severe. *See* 20 C.F.R. § 404.1520a(d)(1) ("If we rate the degree of your limitation in the first three functional areas [i.e., daily activities, social functioning, concentration] as 'none' or 'mild' and 'none' in the fourth area [episodes of decompensation], we will generally conclude your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.").

       Moreover, even assuming the plaintiff's mental impairments were severe, any error at step two of the analysis was harmless because the ALJ nevertheless proceeded to the next steps of the sequential evaluation process and further explained his determination that no mental limitations were warranted. *See Washington*, 698 F. Supp. 2d at 579-80 (explaining that even if an ALJ erroneously determines that impairment is not severe, reversal is not warranted as long as the ALJ considered the impairment in subsequent steps). The ALJ made explicit in his residual functional capacity ("RFC") summary that he was deliberately not including any mental limitations (Tr. 15), consistent with his previously-explained determination that the plaintiff's mental impairments imposed no limitations in any particular area of mental functioning (Tr. 14). The ALJ also noted in his RFC discussion that while the plaintiff claimed to be unable to concentrate or follow simple directions, he admitted to activities necessarily involving some concentration such as watching TV, reading, and playing video games with his son (Tr. 16-17; *see* Tr. 43, 51). In

---

[4]Dr. Clanton provided his opinion prior to Dr. Tollison's evaluation of the plaintiff.

addition, despite noting concerns about the plaintiff's credibility due to his overuse of certain medications and inconsistent statements regarding side effects (Tr. 16; *see* Tr. 43, 530), the ALJ adopted the recommendation of both state agency physicians, Drs. Clarke and Saito, that the plaintiff avoid concentrated exposure to hazards such as machinery in light of these medication concerns (Tr. 15; see Tr. 364, 571).

Based upon the foregoing, the undersigned finds that the ALJ's determination that the plaintiff's mental impairments were not severe was based upon substantial evidence and without error. Furthermore, even assuming the ALJ did err, such error was harmless as the ALJ proceeded to the next steps of the sequential evaluation process and adequately accounted for the plaintiff's mental impairments.

***Treating Physician***

The plaintiff next argues that the ALJ erred in failing to accord substantial deference to the opinion of treating psychiatrist Dr. Lupo. The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

On February 18, 2011, Dr. Lupo completed a Functional Capacity Questionnaire listing the limitations resulting from the plaintiff's psychiatric condition (Tr. 609-11). He reported that the plaintiff's abilities to follow work rules, relate to co-workers, interact with supervisors, deal with work stresses, and maintain attention and concentration were "poor to none." He stated that the plaintiff's ability to deal with the public, use judgment, and function independently were only "fair," which is defined on the form as "seriously limited, but not precluded" (Tr. 609). Dr. Lupo stated that the plaintiff's abilities to understand, remember, and carry out complex job instructions or detailed job instructions were poor to none, and his ability to understand, remember, and carry out simple job instructions was seriously limited. Dr. Lupo noted that the plaintiff's ability to demonstrate reliability was poor to none, and his abilities to maintain personal appearance, behave in an emotionally stable manner, and relate predictably in social situations were seriously limited (Tr. 610).

Following the ALJ's decision on August 30, 2011, Dr. Lupo completed a second Functional Capacity Evaluation on April 4, 2012, which the plaintiff submitted to the Appeal

Council and was made part of the record (Tr. 5, 654-56). Dr. Lupo stated that the plaintiff's ability to follow work rules or relate to co-workers was "poor/none," and his ability to deal with the public and use judgment was "fair," meaning seriously limited, although not completely precluded. Dr. Lupo reported that "severity of depressive illness and chronic pain would preclude him being able to gain or maintain employment" (Tr. 654). Dr. Lupo concluded that the plaintiff's ability to understand, remember, and carry out complex job instructions or detailed job instructions was poor to none, and his ability to understand and remember and carry out simple job instructions was seriously limited. Dr. Lupo also opined that the plaintiff's abilities to maintain personal appearance, behave in an emotionally stable manner, and relate predictably in social situations were seriously limited, and his ability to demonstrate reliability was poor to none. Dr. Lupo again repeated his opinion that the plaintiff was unable to gain or maintain regular employment (Tr. 655).

The ALJ gave "no weight" to Dr. Lupo's February 2011 opinion (Tr. 14-15). In so doing, the ALJ determined that the opinion was not supported by or consistent with the objective medical evidence (Tr. 14-15). As the ALJ noted, Dr. Lupo had seen the plaintiff only four times (beginning in October 2010) when he rendered his February 2011 opinion (Tr. 15; *see* Tr. 612-14). His treatment notes from this period include only limited details, consisting mostly of lists of prescriptions, descriptions of the plaintiff's medical history and activities, and several references to "stress" (Tr. 612-14). The ALJ thus reasonably concluded that Dr. Lupo had "insufficient notes and findings as well as longitudinal evidence" to support the extreme limitations he identified (Tr. 15). The ALJ also noted that Dr. Lupo's opinion was inconsistent with the objective findings of the other sources who treated the plaintiff for depression and anxiety and who acknowledged the plaintiff's periodic stress yet found his functioning in areas such as judgment, concentration, and memory to be normal (Tr. 14-15; *see* Tr. 382-84, 537-38, 577, 617, 624, 629-30). The ALJ's determination is also

23

supported by the opinions of the state agency psychologists[5], particularly Dr. Varner who considered the records of the plaintiff's mental health treatment over time and assessed the functional limitations resulting from his impairments as minimal (Tr. 14; *see* Tr. 563-65).  *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."); *see also Smith v. Schweiker*, 795 F.2d 343, 345-46 (4th Cir. 1986) (stating that a non-examining physician's opinion can be relied upon when it is consistent with the record and that, "if the medical expert testimony from examining or treating physicians goes both ways, a determination coming down on the side of the non-examining, non-treating physician should stand").

Based upon the foregoing, the undersigned finds that the ALJ's decision to give Dr. Lupo's opinion no weight was based upon substantial evidence and was without error.

---

[5]In his reply brief, the plaintiff argues that the ALJ erred in relying on the opinions of the State agency consultants because the credentials of these persons are not included in the record and the reports contain no reference to the evidence that was considered (pl. reply brief at pp. 7-8).  To the extent these arguments are appropriately before the court since they were not raised in the plaintiff's initial brief, *see Anderson v. Dep't of Labor*, 422 F.3d 1155, 1174, 1182 n. 51 (10th Cir. 2005) (because plaintiff did not raise an issue in his opening brief, it is waived), they are without merit. The RFC assessments provided by Drs. Ferrell, Clarke, and Saito specifically reference the evidence they relied upon (*see* Tr. 309, 361-65, 568, 572, 574), and they are identified as medical consultants (Tr. 315, 367, 574). Furthermore Dr. Ferrell's medical consultant's code is 10, indicating a medical specialty in emergency room medicine (Tr. 315). SSA POMS DI 26510.090(D), available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0426510090. Dr. Clarke's medical consultant's code is 20, indicating a medical specialty in neurology (Tr. 367), and Dr. Saito's medical consultant's code is 12, indicating a specialty in family or general practice medicine. *Id. See Lawson v. Astrue*, C.A. No. 3:10-212-HFF-JRM, 2011 WL 4502026, at *11-12 (D.S.C. July 29, 2011) (finding plaintiff's argument that RFC assessment was not completed by a medical doctor to be without merit based upon the evidence of record, including specialty code), *R&R adopted by* 2011 WL 4527320 (D.S.C. Sept. 29, 2011).  Dr. Clanton's Psychiatric Review Technique Form lists "Ph.D." after his name (Tr. 368) and indicates that his code is 38, indicating a specialty in psychology.  SSA POMS DI 26510.090(D), available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0426510090.  Furthermore, he listed in his notes the evidence he relied upon (Tr. 380).  Likewise, Dr. Varner's specialty code is 38, and she specifically listed the evidence she relied upon in making her assessment (Tr. 553, 565).

### *Appeals Council Evidence*

The plaintiff argues that the Appeals Council erred in failing to properly consider certain "new and material" evidence submitted after the ALJ's decision. Specifically, the plaintiff submitted four additional exhibits with his administrative appeal: (1) a September 2011 CT scan of his lumbar spine (Tr. 635-36); (2) progress notes from Dr. Timothy McHenry dated October 2011 through January 2012 (Tr. 638-40, 648-53); (3) records from Dr. Thomas Jarecky dated October through December 2011 (Tr. 641-43, 645-47); and (4) another opinion from Dr. Lupo regarding the plaintiff's ability to perform work-related activities, dated April 2012 (Tr. 654-56). The Appeals Council considered this evidence and determined that it did not provide a basis for changing the ALJ's decision (Tr. 2, 4).

The plaintiff argues that the Appeals Council should have explicitly analyzed this evidence. In *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011), the Fourth Circuit held that the Appeals Council is not required to articulate its rationale for denying a request for review. 662 F.3d at 706. The Fourth Circuit then stated that when the Appeals Council receives additional evidence and denies review, the issue for the court is whether the ALJ's decision is supported by substantial evidence. *Id*. at 707. Under the particular facts presented in *Meyer*, the court determined that the new evidence in that case was not "one-sided" and that upon consideration of the record as a whole, the court could not determine whether substantial evidence supported the ALJ's denial of benefits. *Id*. at 707. In *Meyer*, the ALJ determined that the record lacked certain evidence the ALJ deemed critical; the plaintiff subsequently obtained this evidence and presented it to the Appeals Council. *Id*. On this record, the Fourth Circuit concluded that "no factfinder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record." *Id*. Because "[a]ssessing the probative value of competing evidence is quintessentially the role of the fact finder," the case was remanded to the ALJ for further fact finding. *Id*.

Here, substantial evidence supports the ALJ's findings notwithstanding the new evidence. While the September 2011 CT scan revealed a protruding disk at L4-5 and bilateral stenosis pattern (Tr. 635-36), the ALJ had noted that lumbar X-rays showed the disk bulge and stenosis as early as October 2009 (Tr. 17; *see* Tr. 393). Dr. McHenry, upon viewing this CT scan, did not make any changes to the plaintiff's treatment plan; he continued to prescribe Lortab and periodic translaminar epidural steroid injections (Tr. 640), which Dr. Jarecky administered (Tr. 646). After the first injection was unsuccessful, Dr. McHenry did not prescribe any other new treatments or make any new clinical findings (Tr. 649-50). Furthermore, Dr. Lupo's April 2012 opinion is essentially duplicative of his earlier opinion (Tr. 654-56; *see* Tr. 609-11), which, as explained above, the ALJ reasonably rejected. As argued by the Commissioner, while Dr. Lupo may have been treating the plaintiff longer at the time he provided the second opinion, he did not provide any additional details or supporting treatment records to explain this opinion.

In making his RFC finding, the ALJ acknowledged all of the plaintiff's impairments, particularly his back pain, and determined that notwithstanding this pain, he remained capable of light work, with several postural and environmental limitations (Tr. 15). In reaching this determination, the ALJ considered the objective medical evidence, including X-rays following the 2007 surgery showing that the hardware remained intact, that the thoracic spine was unremarkable, and that the only abnormalities in the lumbar spine were a mild disk bulge at L4-5 and mild stenosis. (Tr. 17; *see* Tr. 251, 393). The ALJ also considered progress reports from the plaintiff's various providers (Tr. 17), including (1) Dr. LeBlond's March 2009 findings of full motor strength, negative straight leg tests, and no particular abnormalities (Tr. 319); (2) Dr. Lindamood's September 2009 findings of normal gait and deep tendon reflexes and absence of motor deficits, joint swelling, or deformity (Tr. 346); (3) Dr. Holdren's fall 2009 findings of full painless range of motion in the thoracic and lumbar spine, normal strength, and normal muscle tone (Tr. 351-52); and (4) Dr. Hutcheson's

26

June 2010 findings of normal gait and station and negative straight leg raising tests (Tr. 546-47).

The ALJ also reasonably determined that the plaintiff's testimony regarding the extent of his pain was not entirely credible. In particular, he noted certain inconsistencies in the plaintiff's testimony, contrasting the plaintiff's assertion that he could walk no more than minimal distances and needed a cane with his admission to Dr. Holdren that he was able to walk his dog, emergency room observation that he had a steady gait despite intense pain, and his failure to bring a cane to the hearing. (Tr. 16-17; *see* Tr. 39-40, 53, 354, 625). The ALJ also noted the plaintiff's admission that he had traveled to Jamaica in 2009, via a two-leg flight (Tr. 17; see Tr. 55). This admission contradicted the plaintiff's testimony that he had not taken any vacations and also undermined his testimony that his difficulty sitting prevented him even from driving more than minimal distances (Tr. 44). Further, the ALJ noted the plaintiff's history of making misrepresentations in efforts to obtain additional prescription drugs, a consideration that reasonably could be considered to further call into question his reliability as a witness (Tr. 14, 16; *see* Tr. 492, 528).

Moreover, the detailed assessments of state agency physicians Drs. Clarke and Saito, who both opined that the plaintiff could perform light work with some postural limitations, further support the ALJ's determination of the extent of the plaintiff's impairments (Tr. 15; *see* Tr. 360-67, 567-74). Dr. Saito, in particular, acknowledged that the records of the plaintiff's examinations and activities suggested a "high level of pain," but noted that she had taken this into account in her opinion of his functional capabilities (Tr. 572). As there is no contradictory medical opinion in the record from any treating source, the ALJ reasonably assessed an RFC similar to Dr. Saito's and Dr. Clarke's recommendations. The ALJ's RFC assessment is even more restrictive than that of Dr. Clarke or Dr. Saito, in that the ALJ determined that in addition to his climbing and balancing restrictions, the plaintiff

27

could only frequently perform other postural activities (Tr. 15); neither Dr. Clarke nor Dr. Saito identified any restriction on these activities (Tr. 362, 569).

The plaintiff disputes the ALJ's assessment of the medical evidence, pointing to the records documenting his long-term, unsuccessful efforts to relieve his back pain, Dr. Lupo's and Dr. Bucci's[6] opinions regarding his ability to work, and considerations which, in his view, bolster his credibility (pl. brief at pp. 21-23). As discussed above, the ALJ considered this evidence, and it is inappropriate for the court to reweigh it or substitute its judgment for the ALJ's. *See Johnson*, 434 F.3d at 653. Based upon the foregoing, the undersigned finds that the record as a whole, including the evidence submitted to the Appeals Council, supports the ALJ's decision.[7]

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

February 21, 2014                                    s/ Kevin F. McDonald
Greenville, South Carolina                           United States Magistrate Judge

---

[6]Notably, Dr. Bucci opined in August 2007 that the plaintiff could not perform his past work as a corrections officer (Tr. 318), which is consistent with the ALJ's findings (Tr. 17-18).

[7]The plaintiff argues in passing that the ALJ's hypothetical to the vocational expert did not include all of his physical and mental limitations (pl. brief at p. 22). Because the undersigned finds that the RFC found by the ALJ was based upon substantial evidence, and the ALJ included those limitations in his hypothetical, this argument is also without merit.